LINDA LYLE, as Administratrix of the Estate of RICHARD F. MARCHEWKA, Deceased, Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 50961.) (Appeal No. 1.)

CAROL L. MURRAY, as Administratrix of the Estate of CASIMER P. RUTKOWSKI, Respondent-Appellant, *v.* STATE OF NEW YORK, Appellant-Respondent. (Claim No. 51069.) (Appeal No. 2.)

Fourth Department, April 11, 1974.

Louis J. Lefkowitz, Attorney-General (Peter Joseph Dooley and Ruth Kessler Toch of counsel), for appellant-respondent.

John M. Daly and Louis Z. Almasi (John M. Daly of counsel), for Linda Lyle, respondent-appellant.

Block, Colussi, Callanan & Crangle (Charles J. Scibetta of counsel), for Carol L. Murray, respondent-appellant.

MOULE, J. This appeal concerns the question of whether the State of New York was negligent in the construction and maintenance of a highway and whether, if so, its negligence was a proximate cause of an accident in which a vehicle, driving off an exit ramp, struck a pylon; or, whether the driver and passenger of the vehicle were negligent and their negligence was a proximate cause of the accident.

The accident occurred at approximately 3:15 A.M. on May 4, 1968 on a one-way junction ramp known as Ramp " B " which carries westbound traffic from the Youngmann Expressway to the Niagara Section of the New York State Thruway. As the Youngmann Expressway runs west toward the Niagara Thruway, it comes to an end at a fork where the northbound traffic cuts off to the right (Ramp " A "), and southbound traffic continues straight, crosses a bridge over the Thruway, and eventually goes around to the south connecting from the west with the Thruway's southbound lanes (Ramp " B ").

Ramp " B " is constructed so that, as soon as a vehicle enters it at the fork, a 3% upgrade is encountered. As one continues westerly along the ramp, at approximately 460 feet from the fork, a lefthand curve to the south begins. The curve starts gradually, builds to its full curvature of 7 degrees 30 minutes at a point 660 feet from the fork, and continues at this degree of curvature until it reaches a point well past where the accident occurred. One hundred and fifteen feet into the curve, or 575 feet from the fork, the roadway begins a 700-foot crest between its 3% upgrade and its descent toward the Thruway. Along this crest, the roadway crosses a bridge, 875 feet from

the fork. At the northeast corner of the bridge, some 5 feet closer to the fork, there is a concrete pylon, 2 feet 10½ inches high and 1 foot 3 inches wide. Annexed to this pylon, and running westerly the length of the bridge, is a concrete safety walk, 10 inches high and 1 foot 8 inches wide.

Ramp "B" is approximately 34 feet wide. It consists of two 12-foot lanes of Portland concrete and a righthand shoulder, consisting of 8 feet of paved bituminous material and 2 feet of topsoil. In the last 50 feet before the bridge, the shoulder narrows to 4 feet 5 inches and, from a point 240 feet from the fork, it is outlined on the north side by a guide rail.[1] The guide rail is centered on the northeast pylon of the bridge but stops 6 inches before reaching it.

Other construction features of Ramp "B" included five 440-watt arc lamps which illuminate the ramp and bridge area, a white line painted between the shoulder and main road for the length of the ramp, and numerous reflectorized delineators placed along the north side of the road, including one on the top of the northeast pylon. In addition there were several signs maintained along both the Youngmann Expressway and the ramp to inform motorists that they were leaving a main highway and should exercise caution to safely negotiate the ramp's curve and crest.

The initial sign notifying a motorist that he was approaching a junction ramp was located on the Youngmann Expressway one mile from Ramp "B". It was 31 feet 6 inches by 17 feet 6 inches and was planted along the right side of the road. It read, "190, Niagara Thruway, Buffalo, Niagara Falls Junction, One Mile". Continuing westerly toward Ramp "B", there were 2 span-type signs hanging over the roadway. The left one (11 feet 6 inches by 9 feet 6 inches) read, "190, South, Buffalo, Keep Left" and the right one (16 feet 6 inches by 9 feet 6 inches) read, "190, North, Niagara Falls, Keep Right". At the fork where the Youngmann separates into the 2 ramps, there were 2 more span-type hanging signs. The sign on the left (11 feet 6 inches by 10 feet) hung directly over Ramp "B" and read, "190, South, Buffalo" with an arrow pointing straight down.

Three hundred feet past the fork, positioned on the right shoulder of the ramp, was a recommended speed sign warning

---

1. There was undisputed testimony that this rail was a guide rail rather than a guard rail, the difference being that a guard rail is a restraining device while a guide rail is primarily a visible guide outlining the road's direction although to a limited extent it also will prevent a vehicle from leaving the highway.

that the 60 m.p.h. speed permitted on the Youngmann Expressway was no longer safe. It read, "Ramp, 30 MPH". Additionally, there was a zebra-striped sign (black and white) planted directly in front of the northeast pylon of the bridge, warning of a hazardous curve.

On the evening of the accident, both the driver of the car which struck the pylon, Marchewka,[2] and his passenger, Rutkowski, had been drinking. It was raining and the pavement was wet. The evidence indicated that Marchewka's car, a 1960 Cadillac, first struck the guide rail 26 feet from the northeast pylon of the bridge and broke it but maintained itself on the edge of the shoulder until it struck the pylon head-on and rolled down an embankment to the Thruway level below. Seventy-seven feet of braking skid marks preceded its initial point of impact with the guide rail.

Portions of the car radiator, water pump and front bumper were left embedded into or folded around the pylon. A body was found on each side of where the vehicle came to rest and car parts were strewn 60 to 70 feet away. There was no eyewitness to the accident, but the physical evidence established that it was severe, causing not only the deaths but also the total mutilation and destruction of the automobile.

The Court of Claims found that the ramp was hazardous and required warning greater than that given on the evening of this fatal accident. The court found that the 30 m.p.h. recommended speed was unrealistically low and, if it were increased to a proper speed, the Uniform Traffic Manual, the primary authority on signing for New York State, would require a curve sign to be placed on Ramp "B". The court also found that the guide rail was installed toward the exterior edge of the northeast pylon and that such an installation was an improper engineering technique which caused the accident. The court further found that the State did not establish proof supporting a finding of contributory negligence.

The questions presented on this appeal are: first, whether the State was negligent in failing to place adequate signs on Ramp "B" because the 30 m.p.h. recommended speed was unrealistically low and because no curve or arrow sign was present on the ramp; second, whether the State was negligent in not providing a guide rail with a greater restraining poten-

2. Rutkowski lost his driver's license in the early 1960's and had not been known to drive since that time. Further, the car was just recently purchased by Marchewka. Therefore, it is properly inferred that Marchewka was driving although the physical evidence does not show who was driving.

tial than the one in place at the time or in improperly positioning the guide rail; third, if the State was negligent, was such negligence a proximate cause of the deaths and, fourth, if negligence and proximate cause are found, whether the decedents were guilty of contributory negligence.

The State has the duty to maintain its highways in a reasonably safe condition, which duty includes giving adequate warning of dangerous conditions in the highway (*Weiss v. Fote,* 7 N Y 2d 579; *Tamm v. State of New York,* 29 A D 2d 601, affd. 26 N Y 2d 719). In the area of signing, the Uniform Traffic Manual is the primary authority establishing standards for the highways in New York State. The manual's provisions relating to recommended speed signs indicate that " full " effectiveness will only be achieved if these signs are realistic and consistent with actual conditions. In determining whether or not the State should be liable where it has exercised discretion in establishing a plan for highway safety, the standard to be applied is whether that plan "was evolved without adequate study or lacked reasonable basis " (*Weiss v. Fote,* 7 N Y 2d 579, 589, *supra*). The evidence suggesting that the use of a 30 m.p.h. speed limit was unrealistically low and established without reasonable basis was testimony that the curve could be safely negotiated at speeds up to 60 m.p.h. and that a ball-bank indicator test resulted in a 50 m.p.h. recommended speed. However, since Ramp " B " is located in an area where heavy traffic was contemplated, it is understandable why the State wished motorists to go slowly around the curve. Furthermore, the fact that there had been prior accidents on Ramp " B " suggests that a low speed was both realistic and reasonable (*Boyce Motor Lines v. State of New York,* 280 App. Div. 693, 697, affd. 306 N. Y. 801).

Although Ramp " B " continues straight at its junction with the Youngmann Expressway and has no deceleration lane, it does not appear to be a continuation of the main highway and therefore the 30 m.p.h. speed on the ramp was not unrealistically low. A motorist approaching Ramp " B " is warned by 3 large signs within a mile of the ramp that a junction with the Niagara Thruway is upcoming. A motorist is then confronted with a split in the roadway at the fork and with a sudden steep rise in the roadbed of approximately 3 feet per each 100 feet traveled. While climbing this grade, a guide rail begins to run next to the road and then a sign reading " Ramp, 30 MPH " comes into view. At this point, it is clear that the State is entitled to assume that no reasonably prudent driver will believe he is still on the main highway.

Since the 30 m.p.h. speed was not unrealistically low, the Uniform Traffic Control Manual's provision (15 NYCRR 231.1 [c] [1]) which requires a curve sign where the recommended speed is less than 60 m.p.h. and greater than 30 m.p.h. is inapplicable. Furthermore, the presence of a guide rail, a zebra-striped reflectorized marker, double delineators, a painted white line outlining the exterior edging of the main roadbed and five 440-watt arc lamps in addition to the 30 m.p.h. sign just 115 feet before the curve suggest that an additional curve sign would be superfluous just as, in a similar case, a reduced speed sign was found to be unnecessary where curve and arrow signs were present (*Stuart-Bullock* v. *State of New York*, 38 A D 2d 626, 628, affd. 33 N Y 2d 418).

The State has a duty to exercise reasonable care in the construction of a guide rail. There is no requirement placed upon the State to construct it with enough restraining potential to prevent a vehicle from breaking the rail (*Gladstone* v. *State of New York*, 23 A D 2d 593, affd. 18 N Y 2d 987). However, the rail must be sufficiently constructed so that it is not an affirmative hazard (*Roberts* v. *Town of Eaton*, 238 N. Y. 420, 422). In this respect, it is urged that the State should have placed the guide rail closer to the road so that a car that struck it would run along it past the pylon and not go into the pylon. However, since the evidence shows that the guide rail was uprooted when decedents' vehicle struck it 26 feet from the pylon, its positioning had nothing to do with the accident and could not have been a proximate cause of it (*Williams* v. *State of New York*, 308 N. Y. 548).

Assuming *arguendo* that the State was negligent in signing Ramp "B", the result of this case would still remain the same because of the general law of proximate cause as set forth by the Court of Appeals in *Tortora* v. *State of New York* (269 N. Y. 167, 170). There the court said (p. 170): "When an automobile swerves and leaves the road for no definitely assignable reason, it is altogether possible that the accident was due to either of several causes, the failure of the steering gear or a lapse on the part of the driver. * * * In * * * such cases the balance of probabilities between causes which entail liability and others which do not is equal enough so that an inference of fact which entails liability is the result of mere speculation." Furthermore, the inference of proximate cause must be the only one which can be reasonably drawn from the facts (*Maislin Bros. Transp.* v. *State of New York*, 15 A D 2d 853, 854; *Boyce Motor Lines* v. *State of New York*, 280 App. Div.

693, 696, affd. 306 N. Y. 801, *supra*). In final result, it is clear that, if it is just as likely that the accident might have occurred from causes other than a defendant's negligence, the inference that his negligence was the proximate cause of the accident may not be drawn (*Cole* v. *Swagler*, 308 N. Y. 325; see, also, *Frohm* v. *State of New York*, 34 A D 2d 724, affd. 28 N Y 2d 703).

In applying the above standards to the accident herein, it is clear that it is impossible to determine what actually caused it. The decedents' vehicle apparently was moving considerably faster than the 30 m.p.h. recommended speed as evidenced by the 77 feet of braking skid marks left by the vehicle before it struck the guide rail, the uprooting of the guide rail by the force of the impact, the continued force of the vehicle in moving 26 more feet into the pylon and, finally, the physical evidence of the total destruction of the vehicle.

In conclusion, it appears that the State committed no negligent act which could be considered a proximate cause of the accident. Rather, it would seem that the accident was caused either by the decedents' own contributory negligence in entirely ignoring the warning signs or by a mechanical failure of the decedents' automobile.

The judgments should be reversed and claims dismissed.

WITMER, J. P., CARDAMONE, GOLDMAN and DEL VECCHIO, JJ., concur.

Judgments unanimously reversed on the law and facts, without costs, and claims dismissed.