■ Rona Epstein, Appellant, v State of New York, Respondent

On December 14, 1979, the claimant Rona Epstein was driving in the middle of three eastbound lanes on Hempstead Turnpike near its intersection with Front Street in the Town of Hempstead. At this particular intersection, Hempstead Turnpike is a six-lane highway which is divided by a mall. At the time of the claimant's accident, a barrier of corrugated steel had been constructed on the mall. The accident which is the subject of this claim occurred when a vehicle driven by one Richard Svalas which was traveling westbound on Hempstead Turnpike catapulted off and over the barrier, "sailing" into the air, after which it crashed upon the claimant's car. The top of the claimant's car was sheared off and she sustained very serious injuries.

The claimant commenced this claim against the State, seeking to recover her damages which allegedly resulted from the State's negligent design, construction and maintenance of the mall and guide rail. This court affirmed an order of the Court of Claims which granted the claimant's motion to file a late notice of claim *(Epstein v State of New York,* 88 AD2d 967).

A trial on the issue of liability was held, at which neither the claimant nor Svalas testified. Prior to trial, Svalas had settled the claimant's action against him. The examination before trial of Svalas in that action was admitted into evidence herein. At that examination, Svalas had testified that he did not recall much about the accident other than that he had been proceeding westbound on Hempstead at approximately 40 to 45 miles per hour, intending to make a left turn onto Front Street. His left front wheel hit the curb, about eight car lengths east of the intersection, and he lost control of the car. Although the car had a loose front end, Svalas testified that this did not impede his ability to steer and that he did not steer the car into the curb.

Svalas conceded having drunk some alcohol earlier that evening but denied being intoxicated while driving. His plea of guilty to a violation of Vehicle and Traffic Law § 1192 (2) for driving while intoxicated was admitted in evidence at the trial.

Other eyewitnesses to the accident testified that Svalas's car was traveling at a fast rate of speed and was weaving. One witness estimated that Svalas's vehicle may have been traveling at a rate of 75 miles per hour. The eyewitnesses agreed that Svalas's vehicle hit the mall between the lanes, and that its wheels went up upon the guide rail, which one described as a ramp, and another as similar to a ski slope.

With respect to the design and construction of Hempstead Turnpike, the claimant produced the examinations before trial of two New York State Department of Transportation engineers. That testimony established that when construction on the turnpike was started in 1956, there were plans for a median mall; however, those plans do not depict a median barrier at the location of the accident. At the time of the accident, the median mall had an earth surface with a W-type guide rail on both sides. The end of the rail that was approached by westbound traffic was twisted into the ground. The mall at the intersection of Hempstead Turnpike and Front Street is approximately 10 feet wide. the length of the mall between Front·Street and the most easternly intersection with Hempstead Turnpike is approximately 480 feet. The mall narrowed from approximately a 20-foot width to 10 feet at a point some 125 feet east of the intersection with Front Street. The guide rail ran down the middle of the mall for about 37 feet from a point on the mall five feet east of Front Street. None of the witnesses knew when this guide rail was first constructed, nor were they able to locate any plans or studies for the construction.

The engineers' testimony revealed that the New York State Department of Transportation did further construction work on the mall in 1967 or 1968. One of the engineers testified that attendant specifications provided for end treatment alterations to the guide rail in question. The plans indicated to the engineer that a guide rail was already in place. According to the engineer, the contract, which included two standard structure sheets which were made a part thereof, required that the anchor at the leading end of the guide rail be placed such that the farthest edge from the center should be set back a minimum of four feet, where possible, from the location of the existing guide rail. The engineer did not answer an inquiry as

to the reason for this requirement, stating that he was not an expert, but noted that no reasons were set forth in the State specifications. He testified that the new guide rail was constructed according to the plans; however he was not allowed to answer whether it was set back four feet. The plans were approved by the engineer in charge, as was the ultimate construction.

At trial, the claimant's experts testified that the guide rail, as altered in 1967 and as shown on one of claimant's photographic exhibits, was not constructed in conformity with the New York State Department of Transportation contract to State specifications, or to generally recognized engineering safety, design and construction standards of the time. The contract specified that there be a four-foot flare out or set back of the approach end of the guide rail but, in fact, the end treatment was not offset at all. According to these experts, one of the purposes for requiring that a barrier or guide rail end be flared is to avoid vehicles straddling and vaulting the median. Although the State's sole expert disagreed with the testimony that the actual construction of the guide rail deviated from the contract or from acceptable standards of engineering practice, and believed that no flare-end treatment was required for the subject guide rail due to its particular location and purposes, he did generally agree with the statement from a manual published by the American Association of State Highway and Transportation officials that "to be crash worthy, the end treatment should not spear, vault or roll the vehicle for head-on or nose impacts".

When asked a hypothetical question premised upon the facts of this accident, the claimant's experts all agreed that the design and construction of the guide rail was a competent producing cause of the accident. The hypothetical question did not include an assumption with regard to the speed of the vaulting vehicle but one of those experts did testify that he assumed that the vehicle had to be traveling in excess of 40 miles per hour. Another testified that from the studies he had seen, the car would not have vaulted had the end of the guide rail been constructed with the offset. There was testimony that the minimum acceptable flare or offset for this particular type, as of 1967, was four feet.

The State's expert testified that having the four-foot flare would have caused an additional hazard for eastbound traffic and thereby justified its omission. He contended that the contract allowed for discretion on the part of the engineer in charge as to the amount of flare or whether there would be

any flare at all, although he conceded that in 1967 good and acceptable practice generally consisted of flaring the end of the guide rail where possible. According to this witness, a vehicle traveling at speeds of up to 40 miles per hour would not have vaulted this type of guide rail upon impact and that the guide rail would instead deform under the car's weight and decelerate it. He concluded that even at a speed of 60 miles per hour, a car would not have flipped into the eastbound lane, as occurred here. The expert also indicated that a search of the accident history for the area in question revealed no prior vaulting accidents where a car rode up the guide rail.

On cross-examination, the State's expert was questioned about tests conducted in 1977 regarding vaulting of automobiles which rode up on sloping barriers. The expert testified that in one test a car traveling at 46 miles per hour had impacted at the end of a sloped barrier, was airborne for a distance of 70 feet, and was eventually redirected into its initial traveling lane. In that test, the guide rail had been constructed with a two-foot nine-inch offset.

Finally, the State's expert acknowledged that the State specifications, set forth in New York State Standard Structure Sheet 66-17A (and which was made a part of the contract) called for the sloping barrier to be set back four feet. In addition, he conceded that the plan called for removal of the existing guide rail with replacement by a new guide rail 37 feet long, which was "supposed to have been flared and buried".

After the close of the case, the court reserved decision on the State's motions to dismiss the claim on the ground that the claimant had failed to establish a prima facie case of negligence. The trial court thereafter rendered a memorandum decision in which it granted those motions to dismiss. The court stated that despite the claimant's contention that the absence of the four-foot flare violated the State's own standards, it credited the State's expert's testimony that such a flare would create a hazard for eastbound traffic, that the plans left the discretion to the engineer, and that the engineer's judgment was in accordance with good engineering practice then and now. The court did not address the issue of whether the State could rely on the doctrine of qualified governmental immunity (Weiss v Fote, 7 NY2d 579), even though the State was unable to produce any plans for the initial installation of the guide rails, since it did not find the State to be negligent and otherwise liable. Finally, the court

held that another ground for dismissal was the claimant's failure to show proximate cause, stating that there was "not sufficient evidence to indicate that the flare argued for by claimant would 'probably' have prevented the accident" and that "[a]t the outrageous speed Svalas was going, it would have taken something akin to the proverbial brick wall to stop him".

"For more than 50 years * * * since the 1925 amendment to the Constitution (art VI, § 5), the rule has been that the power of the Appellate Division * * * is as broad as that of the trial court (*Jacques v Sears, Roebuck & Co.,* 30 NY2d 466, 471; *O'Connor v Papertsian,* 309 NY 465, 471-472) and that as to a bench trial it may render the judgment it finds warranted by the facts, taking into account in a close case 'the fact that the trial judge had the advantage of seeing the witnesses' " (*Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492, 499, quoting from *York Mtge. Corp. v Clotar Constr. Corp.,* 254 NY 28, 133-134). Applying the aforesaid standard of review to the case at bar, we conclude that the Court of Claims determination should not be disturbed.

From our review of this particular construction contract, the State specification sheet incorporated therein, and the testimony adduced at trial from all of the expert witnesses, we conclude that the State did not lack discretion to construct the subject guide rail without a flared end. The State's deviation from the contract and specification requirements is not negligence per se (*cf. Piarulli v Lason,* 35 AD2d 605), nor does it necessarily constitute a breach of its duty to exercise reasonable care in the construction (*but see, Warren v New York State Thruway Auth.,* 51 AD2d 679, *lv to appeal denied* 38 NY2d 712). Here, the trial court found the State's expert witness to be credible with respect to the reason that the guide rail was not flared and that such construction was in accordance with good engineering practice at the time. This determination should not be disturbed.

The State is not an insurer of the safety of its highways and the design, construction and maintenance of same are entrusted to its sound discretion as long as the highway is constructed and maintained in a reasonably safe condition (*Tomassi v Town of Union,* 46 NY2d 91, 97). Although there is no requirement that a guide rail be constructed with enough restraining potential so as to prevent a car from breaking it, the guide rail must be sufficiently constructed so as not to create an affirmative hazard (*Murray v State of New York,* 44 AD2d 239, 244, *affd* 38 NY2d 782). The State therefore has a

duty to furnish guide rails which are safe *(Gutelle v City of New York,* 55 NY2d 794, 796). We do not find that the construction of the subject guide rail failed to meet this standard.

Furthermore, before the State can be found liable, there must be a showing that the event causing the injury was foreseeable and that, in the exercise of reasonable care, the State could have protected against such event *(Gladstone v State of New York,* 23 AD2d 593, *affd* 18 NY2d 987). Failure to guard against a remote possibility of accident or one which, in the exercise of ordinary care, could not be foreseen will not constitute negligence *(Payne v City of New York,* 277 NY 393, 396). Here, there was no evidence of any prior accidents involving a car vaulting and crossing over the subject guide rail, nor do we find that the tests conducted in 1977, as testified to by the State's expert, could be deemed as giving notice that such an event might occur. In those tests, the vehicle which was sent airborne was apparently traveling at a speed much slower than that of Svalas's car and was redirected back into its own lane by a flared guide rail. The claimant did not establish that a vehicle moving at a considerably faster speed and approaching a nonflared guide rail would not only be sent airborne but would also continue across the divider, although we do note the State's expert's testimony that a sloping barrier may cause a car to vault depending on the type of barrier and speed of the car. Having found no basis to hold the State liable for the design, construction or maintenance of the guide rail, we additionally agree with the Court of Claims that the issue of qualified governmental immunity need not be addressed.

Finally, we also find that no evidence was adduced that the subject guide rail was a proximate cause of the accident, despite testimony to that effect by her expert witnesses. The trial court aptly observed that Svalas's car was traveling at a speed which was highly excessive and that any claimed negligence on the part of the State would have had no effect in causing the accident. Mollen, P. J., Mangano, Thompson and Bracken, JJ., concur.