Edward J. Greenfield, J.
The question presented in this case is whether the sexual conquest by a predatory male of a resisting female constitutes rape or seduction.
In making the distinction, we must deal with patterns of behavior which have been exhibited by aggressive males towards gentle or timid or submissive females, the broad outlines of which have been similar for hundreds or maybe thousands of years, but the particulars of which vary markedly in individual cases.
It is a fact, I suppose, that since before the dawn of history men with clubs have grabbed women, willing or unwilling, by *1090 the hair, to have their way with them. Techniques have become more varied and more subtle with the years.
As we have become more civilized, we have come to condemn the more overt, aggressive and outrageous behavior of some men towards women and we have labeled it "rape”. We have attempted to control or deter it by providing for extremely heavy sentences, second to and, in some jurisdictions, equalled by the penalties set by the law for murder.
At the same time we have recognized that there are some patterns of aggression or aggressive male sexual behavior toward females which do not deserve such extreme penalties, in which the male objective may be achieved through charm or guile or protestations of love, promises or deceit.
Where force is not employed to overcome reluctance, and where consent, however reluctant initially, can be spelled out, this we label "seduction,” which society may condone, even as it disapproves.
There is some conduct which comes close to the line between rape and seduction. This is such a case.
Since a jury has been waived, this court is called upon to scrutinize the conduct involved and to draw the line between the legally permissible and the impermissible and to determine on which side of the line this conduct falls.
Rape is defined in subdivision 1 of section 130.35 of our Penal Law as follows: "A male is guilty of rape in the first degree when he engages in sexual intercourse with a female: 1. By forcible compulsion”.
Rape can also be premised upon other conditions which would indicate the incapacity of a female to give consent either in actuality or as a matter of law. We are concerned here with the first subdivision, sexual intercourse by forcible compulsion. That is the essence of the crime.
Forcible compulsion is defined in subdivision 8 of section 130 of the Penal Law as "physical force that overcomes earnest resistance; or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person, or in fear that he or another person will immediately be kidnapped.”
Rape, though it sometimes may be abetted by other females, appears to be exclusively a proscribed activity for males.
Seduction, on the other hand, may be freely indulged in by both sexes. It involves allurement, enticement, or persuasion, *1091 to overcome initial unwillingness or resistance. Its ends may be achieved by fair means or foul, but seduction eschews the crudities of force and threats. In which category does defendant’s conduct fall?
In answering that inquiry, and based upon the testimony in this case, the court first makes the following findings of fact:
The defendant, a bachelor of approximately 37 years of age, aptly described in the testimony as "glib”, on July 15, 1974 met an incoming plane at LaGuardia Airport, from which disembarked Lucy Elizabeth Peterson of Charlotte, North Carolina, a 20-year-old petite, attractive second-year student at Wellesley College, an unworldly girl, evidently unacquainted with New York City and the sophisticated city ways, a girl who proved to be, as indicated by the testimony, incredibly gullible, trusting and naive.
The testimony indicates that the defendant struck up a conversation with her, posing as a psychologist doing a magazine article and using a name that was not his, inducing Miss Peterson to answer questions for an interview.
The evidence further shows that the defendant invited Miss Peterson to accompany him by automobile to Manhattan, her destination being Grand Central Station. They were accompanied in the automobile by other persons, some of whom were introduced by the defendant as colleagues on a professional basis. But it appears that a funny thing happened on the wáy to the station. There were numerous detours before Beth Peterson ever found her way to Grand Central Station. First, they were taken to an apartment on the East Side.
Then the evidence indicates that this defendant and a girl named Bridget took Miss Peterson to an establishment called Maxwell’s Plum, which the defendant explained was for the purpose of conducting a sociological experiment in which he would observe her reactions and the reactions of males towards her in the setting of a singles bar. After several hours there, in which Miss Peterson evidently was still under the belief that her stopping for a drink at Maxwell’s Plum was part of this psychological and sociological experiment, she was persuaded to accompany the defendant to the West Side, upon the defendant’s explanation that he was there going to pick up his automobile and drive her to Grand Central Station.
Instead of going to the automobile, she was induced to come *1092 up to an apartment on the 14th floor, which the defendant explained was used as one of his five offices or apartments throughout the city; and Miss Peterson, still believing that the defendant was in fact what he purported to be, went up and accompanied him there. That apartment, Apartment 14-D, at 1 Lincoln Plaza, was in truth and in fact the apartment of one Heinz Patzak, who ran the Austrian National Tourist Bureau and who at that time was in Austria. Mr. Patzak has testified that he never had given approval or permission for the defendant to enter, use or occupy that apartment.
Miss Peterson came to the apartment and her questions as to the existence of photographs of children, a crib, stuffed animals and toys, were readily explained away by the defendant as being connected with his treatment of patients as a psychologist, the explanation of the crib and the toys being that these were used for the purposes of primal therapy to enable his patients to associate with their childhood years more readily. In the apartment the psychological interviewing continued, the defendant having explained to Miss Peterson that he was searching for the missing link between the "girl-woman” and the "woman-girl”. Miss Peterson, who was then working in a psychiatric branch of New York Hospital, Cornell Medical School, in White Plains, and who had some training in psychology, believed that all of this legitimately related to a psychological research project which the defendant was conducting.
During the course of the interview in the apartment the defendant probed Miss Peterson’s life and she had, during the course of their conversation together, made a revelation of her prior intimacies and her feelings, and her experiences with respect to various people. In the apartment she was asked to participate in an adjective word game, applying five adjectives to certain designated persons, including herself and the defendant.
She had been there for one to two hours when the defendant made his move and pulled her on to the opened sofa bed in the living room of that apartment and attempted to disrobe her. She resisted that, and she claims that as articles of clothing were attempted to be removed she would pull them back on and ultimately she was able to ward off these advances and to get herself dressed again. At that point, the defendant’s tactics, according to her testimony, appeared to have changed.
*1093 First, he informed her of his disappointment that she had failed the test, that this was all part of his psychological experiment, that, in fact, this was a way in which he was trying to reach her innermost consciousness, one of the ways in which that could be done. Then, after expressing disappointment in the failure of this psychological experiment, he took steps to cause doubt and fear to arise in the mind of Miss Peterson. He said, "Look where you are. You are in the apartment of a strange man. How do you know that I am really who I say I am? How do you know that I am really a psychologist?” Then, he went on and said, "I could kill you. I could rape you. I could hurt you physically.”
Miss Peterson testified that at that point she became extremely frightened, that she realized, indeed, how vulnerable she was. The defendant did not strike her, did not beat her, he exhibited no weapons at the time, but he made the statement, "I could kill you; I could rape you.”
Then there was yelling and screaming, further to intimidate the defendant, and then an abrupt switch in which the defendant attempted to play on the sympathy of Miss Peterson by telling her a story about his lost love, how Miss Peterson had reminded him of her, and the hurt that he had sustained when she had driven her car off a cliff. Obviously, Miss Peterson’s sympathy was engaged, and at that time acting instinctively, she took a step forward and reached out for him and put her hand on his shoulders, and then he grabbed her and said, "You’re mine, you are mine.” There thereupon followed an act of sexual intercourse, an act of oral-genital contact; a half-hour later a second act of sexual intercourse, and then, before she left, about seven o’clock that morning, an additional act.
The sexual intercourse appears to be corroborated by the findings of the laboratory confirmation of seminal fluid on the underclothing which she had worn at the time.
The testimony indicates that during these various sexual acts Miss Peterson, in fact, offered little resistance. She said that she was pinned down by the defendant’s body weight, but in some manner all her clothing was removed, all his clothing was removed, and the acts took place. There was no torn clothing, there were no scratches, there were no bruises. Finally, at approximately 7:00 a.m. Miss Peterson dressed and left the apartment. She says that the defendant acknowledged to her that he was aware that it had been against her will, *1094 but he nevertheless gave her three telephone numbers. Miss Peterson then returned to White Plains, where later that day she recited some of the events to a fellow worker, and then to a roommate. Ultimately she reported the facts to the New York City Police and to the Westchester County Sheriffs office, resulting in her being taken to New York City by personnel from the Westchester County Sheriffs office where, at the Gulf & Western Building at Columbus Circle they saw the defendant emerging from an elevator. Despite her identification of him at that time the defendant initially denied that his name was Marty, that he knew Miss Peterson, or that he had had any involvment with her in any way.
After he had been placed under arrest in a coffee shop of the Mayflower Hotel, and they had proceeded to the building at No. 1 Lincoln Plaza, the defendant began to make partial admissions as to his identity, his occupation of Apartment 14D at No. 1 Lincoln Plaza, his knowledge of Miss Peterson and ultimately the fact that he had had sexual intercourse with her, which he claimed was consensual and a matter of mutual enjoyment. He further told the police officers that the whole psychology bit was a "game that he played with girls’ heads.”
The testimony further indicates that after he had been placed under arrest, and while he was in custody, he escaped from the police car in which he had been placed, and that Detective Kelleher chased him in and around the streets and up 15 flights of a building, where he ultimately located Evans on a water tower. The explanation given to Detective Magnusson was that he was looking for a lawyer.
Those being the facts, the court arrives at the following conclusions:
The court finds that the testimony of Beth Peterson was essentially credible testimony. The court finds from the story which she has narrated that the defendant was a person who was crafty, scheming, manipulative, and ever ready with explanations.
From the testimony which has been given there are some factors which tend to point toward guilt and some towards innocence. As factors indicating guilt are the assumption of the false identity by the defendant, his not giving his true name, his denial to the police when first confronted of what his name was, and his denial of any knowledge of Miss Peterson, which denials he ultimately retracted. Then, of course, there is the evidence about flight which is always *1095 evidence that can be considered as evincing some consciousness of guilt. On the other hand, there are some factors pointing to innocence on the part of the defendant, and a lack of criminal culpability on his part. The fact that Miss Peterson had no bruises or scratches, no torn clothing, that she had been allowed to proceed from the apartment without any further threats or concealment as to location. The fact that she was given phone numbers by the defendant which made it relatively easy to trace his location and whereabouts; the fact that he attempted to call her on several occasions after she had left the apartment; and the fact that he had continued in his prior haunts at the Gulf & Western Building and at No. 1 Lincoln Plaza. From all this, the court concludes that the defendant inveigled Miss Peterson, deceived her, put her on, and took advantage of her.
The question is whether having had sexual intercourse by the same means described constitutes rape in the first degree. The essential element of rape in the first degree is forcible compulsion. The prevailing view in this country is that there can be no rape which is achieved by fraud, or trick, or stratagem. (75 CJS, Rape, § 16; Ann 91 ALR 2d 593.) Provided there is actual consent, the nature of the act being understood, it is not rape, absent a statute, no matter how despicable the fraud, even if a woman has intercourse with a man impersonating her husband (Lewis v State, 30 Ala 54); or if a fraudulent ceremony leads her to believe she is legally married to a man (State v Murphy, 6 Ala 765), (contra if an explicit statute to that effect exists, e.g., State of Arizona v Navarro, 90 Ariz 185) or even if a doctor persuades her that sexual intercourse is necessary for her treatment and return to good health. (Don Moran v People, 25 Mich 356; Commonwealth v Goldenberg, 338 Mass 377, cert den 359 US 1001.) "Fraud cannot be allowed to supply the place of the force which the statute makes mandatory. See Mills v United States, 164 U.S. 644, 648.” (Id., p 384.)
It should be noted that seduction, while not considered to be a criminal act at common law (79 CJS, Seduction, § 31), has been made a criminal offense by statute in some jurisdictions. In seduction, unlike rape, the consent of the woman, implied or explicit, has been procured, by artifice, deception, flattery, fraud or promise.
The declared public policy of this State looks with disfavor on actions for seduction since the civil action was abolished *1096 more than 40 years ago (Civ Prac Act, §§ 61-b, 61-d; now Civil Rights Law, § 80-a). The statute did not repeal any Penal Law provisions (Civ Prac Act, §§ 61-h, 61-i, now Civil Rights Law, § 84), but there are no presently existing penal sanctions against seduction. The law recognizes that there are some crimes where trickery and deceit do constitute the basis for a criminal charge. Since the common law, we have recognized the existence of larceny by trick. But of course, for a larceny there has to be a taking of property of value. I do not mean to imply that a woman’s right to her body is not a thing of value, but it is not property in the sense which is defined by the law.
It is clear from the evidence in this case that Beth Peterson was intimidated; that she was confused; that she had been drowned in a torrent of words and perhaps was terrified. But it is likewise clear from the evidence that the defendant did not resort to actual physical force. There was " 'no act of violence, no struggle, no outcry, and no attempt to restrain or confine the person . . . which constitute the usual . . . and essential evidence’ of rape.” (Commonwealth v Goldenberg, supra, p 383, citing Commonwealth v Merrill, 14 Gray 415, 417.) The restraint which was imposed upon Miss Peterson was a restraint imposed by his body weight, which would be the normal situation in which any sexual contact would be achieved. Miss Peterson manifested little or no resistance. She indicated at some point she kicked. I asked her what she was doing with her arms and hands at the time. The answers indicated that it was not very much. Now, that can be understandable. A woman is not obligated to resist to the uttermost under all circumstances, when her will to resist has been paralyzed by fear and by threats. That is why the law recognizes the existence of a threat as being the equivalent of the use of actual force. As stated in People v Connor (126 NY 278, 281-282), an ancient but still followed case, in the Court of Appeals: "the extent of the resistance required of an assaulted female is governed by the circumstances of the case, and the grounds which she has for apprehending the infliction of great bodily harm. When an assault is committed by the sudden and unexpected exercise of overpowering force upon a timid and inexperienced girl, under circumstances indicating the power and will of the aggressor to effect his object, and an intention to use any means necessary to accomplish it, it would seem to present a case for a jury to say whether the fear naturally inspired by such circumstances, had not taken away or im *1097 paired the ability of the assaulted party to make effectual resistance to the assault.”
Whether resistance was useless under the prevailing circumstances is always a question for the trier of facts. (People v Yannucci, 283 NY 546, 550; People v Dohring, 59 NY 374, 382.)
So the question here is not so much the use of force, but whether threats uttered by the defendant had paralyzed her capacity to resist and had, in fact, undermined her will. Now, what was it the defendant said? He said, "Look where you are. You are in the apartment of a strange man. How do you know that I really am who I say I am? How do you know that I am really a psychologist? I could kill you. I could rape you. I could hurt you physically.” Those words, as uttered, are susceptible to two possible and diverse interpretations. The first would be in essence that — you had better do what I say, for you are helpless and I have the power to use ultimate force should you resist. That clearly would be a threat which would induce fear and overcome resistance. The second possible meaning of those words is, in effect, that — you are a foolish girl. You are in the apartment of a strange man. You put yourself in the hands of a stranger, and you are vulnerable and defenseless. The possibility would exist of physical harm to you were you being confronted by someone other than the person who uttered this statement.
Of course, it is entirely possible that Miss Peterson, who heard the statements, construed that as a threat, even though it may not have been intended as such by the person who uttered those words. The question arises as to which is the controlling state of mind — that of a person who hears the words and interprets them as a threat, or the state of mind of the person who utters such words. It appears to the court that the controlling state of mind must be that of the speaker.* She, the hearer, may, in fact, take the words as a threat and be terrified by them. Sometimes that may be reasonable under all the circumstances. Sometimes it may be a rather hysterical reaction to words which would not justify the induction of *1098 that terror. But this being a criminal trial, it is basic that the criminal intent of the defendant must be shown beyond a reasonable doubt. It is his intent when he acts, his intent when he speaks, which must therefore be controlling. And so, if he utters words which are taken as a threat by the person who hears them, but are not intended as a threat by the person who utters them, there would be no basis for finding the necessary criminal intent to establish culpability under the law.
So where a statement is ambiguous, where the words and the acts which purport to constitute force or threats are susceptible of diverse interpretations, which may be consistent with either guilt or innocence, the court, as the trier of the facts, cannot say beyond a reasonable doubt that the guilt of the defendant has been established with respect to the crime of rape. The words which were uttered both as to what the defendant could do, "I could kill you. I could rape you.” and subsequent words that he was going to do to the complainant what his lost love had done to him — the court finds are ambiguous. They were not accompanied by violence. They were not accompanied by a demonstration of the intention to carry out the threats. There was no beating. There was no weapon displayed. There was a statement as to a possibility, a statement of vulnerability. The court finds it cannot conclude that there was the utterance of a threat of such a nature as to enable the court to find the defendant guilty of the crime of rape in the first degree beyond a reasonable doubt. Since the court, therefore, can find neither forcible compulsion nor threat beyond a reasonable doubt, the defendant is found not guilty on the charges of rape, sodomy and unlawful imprisonment.
Now, acquittal on these charges does not imply that the court condones the conduct of the defendant. The testimony in the case reveals that the defendant was a predator, and that naive and gullible girls like Beth Peterson were his natural prey. He posed. He lied. He pretended and he deceived. He used confidences which were innocently bestowed as leverage to effect his will. He used psychological techniques to achieve vulnerability and sympathy, and the erosion of resistance. A young and inexperienced girl like Beth Peterson was then unable to withstand the practiced onslaught of the defendant. The defendant apparently got his kicks through the exercise of these techniques. He apparently spurned the readily aVaila *1099 ble women, the acquiescent women, like Bridget, who was living in the same apartment. To him, the game was worth more than the prize. He boasted to the police that this was a game he played with girls’ heads. The court finds his conduct, if not criminal, to be reprehensible. It was conquest by con job. Truly, therefore, this defendant may be called "The Abominable Snowman.”
So bachelors, and other men on the make, fear not. It is still not illegal to feed a girl a line, to continue the attempt, not to take no for a final answer, at least not the first time. But there comes a point at which one must desist. It is not criminal conduct for a male to make promises that will not be kept, to indulge in exaggeration and hyperbole, or to assure any trusting female that, as in the ancient fairy tale, the ugly frog is really the handsome prince. Every man is free, under the law, to be a gentleman or a cad. But take heed. Violence, force and threats are totally out of bounds. Their employment will transform a heel into a criminal.
While the court must conclude that the defendant’s conduct towards Miss Peterson cannot be adjudged criminal so as to subject him to the penalty of imprisonment for up to 25 years, the court finds, on the undisputed facts, that defendant did enter Apartment 14-D, at No. 1 Lincoln Plaza, the dwelling of Heinz Patzak and his family, illegally and without permission or authority. There being no proof that the illegal entry was for the purpose of committing a crime, the defendant is found not guilty of the charge of burglary in the second degree. But he is found guilty of the lesser included offense of criminal trespass in the second degree, pursuant to section 140.15 of the Penal Law, under Indictment No. 3861 of 1974.
Further, the evidence clearly establishes that the defendant, after having been arrested for a felony, escaped from the custody of the police officers, and he is found guilty of the crime of escape in the second degree, under section 205.10 of the Penal Law.
It may be ironic that the defendant, having been acquitted of the charges for which he was arrested, is found guilty of attempting to flee from the possibilities of having to face up to the charge. But the facts are clear, and whatever consequences flow from that fact will flow. The defendant fancied himself to be terribly clever, but, as frequently happens with terribly clever men, he made a rather stupid mistake.

 On the same date as this decision the press reported a decision by the British House of Lords, holding that there could be no conviction of rape if the accused really believed that there was consent, despite the vociferous protest of the woman, when he had been told beforehand that she preferred intercourse to be accomplished over her vehement protests. The principle, of course, is that the subjective state of mind of the defendánt controls in determining criminal intent.