OPINION OF THE COURT
James P. King, J.
This is an action for wrongful death and conscious pain and suffering. Trial of the action was bifurcated, and this decision relates only to the issue of liability.
On March 20, 1993, at approximately 7:30 p.m., Timothy P. Johnson and a companion were traveling in a Chevrolet pick-up truck westbound on Route 23B, a two-lane highway in the Town of Greenport. Near County Route 29 (also called Spook Rock Road), their vehicle was pulled over by New York State Police Trooper Frederick C. Muller, III. Muller had been following the truck for a short distance and stopped it because of a nonworking taillight and loud exhaust. Johnson, who was driving, pulled the truck over to the side of the road but did not take it fully onto the shoulder. The Trooper parked five to six feet behind the truck.
After speaking with Johnson and observing signs suggesting that he had consumed alcohol, Trooper Muller asked Johnson to exit the vehicle and directed him to stand behind his truck, off the roadway. He then conducted a series of field sobriety tests, which Johnson reportedly failed. Johnson was then told to return to his vehicle while Trooper Muller called in a license and registration check.[1] Johnson’s passenger, Bruce Mann, testified that Johnson did not say anything as he waited in the truck.
On the basis of the field tests, as well as other signs such as the smell of alcohol, Muller determined to arrest Johnson and returned to the truck. Once again, Johnson was asked to get out, and once again he complied with this request. Trooper Muller again took Johnson to the rear of the truck, informed him that he would have to have a breathalyzer test, placed him under arrest, handcuffed him with his hands in the front of his body and facing inward, and conducted a pat-frisk. Muller then had Johnson get into the right front passenger *195 seat of the patrol car, where he was secured by the lap belt and shoulder harness. The seat belt was a three-point system, and the latching mechanism released when a button was pressed. The patrol car was a four-door Chevrolet Caprice. Neither the rear doors nor the rear windows could be operated from the inside, except from the front seat, while the front windows and doors operated normally.
Observing that Johnson’s truck was partially on the road, the Trooper left his patrol car and went back to ask Mann if he had a driver’s license and would be able to move the truck. Mann said that he did not and added that he had also been drinking. Muller returned to the patrol car, where he discussed with Johnson whether to call a tow truck or leave it further off the road for Johnson’s wife to retrieve. Following that conversation, and with Johnson’s permission, Muller returned to the truck to move it off the roadway. He had difficulty starting the motor but, when that was accomplished, he drove the truck 15 to 25 yards further along the road, angling it into the entrance of Kling Magnetics. When he tried to remove the key from the ignition it jammed, and after several attempts, Muller just left it there.
Muller acknowledged that he lost sight of the patrol car for a brief period of time while relocating the other vehicle. He estimated approximately two minutes passed between his leaving Johnson and returning to the car. Bruce Mann testified that it took about five minutes for the truck to be moved. When asked whether he had any concerns about Johnson’s possibly escaping while he was away, Muller testified that he had considered the possibility but after talking with Johnson, who was cooperative throughout, he did not think there would be any attempt.
When Muller got out of the truck and headed back to the patrol car, he saw that the passenger door was open and that his prisoner was no longer in the car. At first, he searched around the immediate area, trying to see if there were tracks or if Johnson was hiding behind the car. He then ran back to the truck; spoke briefly to Mann, who had not seen Johnson leave the patrol car; and ran out to the center of the road to look back beyond a slight curve in the road. A passing car slowed down, and its occupants informed him that they had seen someone running down Shortcake Farm Road which was close to a bridge over Claverack Creek about 150 to 200 yards to the east. Muller got into the patrol car, made a U-turn and, once at the bridge, got out and looked under and around the *196 bridge to see if Johnson might be hiding there. He testified that he did not want to go too far from the truck, however, because the key was still in the ignition and he did not want Johnson to be able to drive away. During this entire period, he was also yelling and calling out to Johnson.[2] Muller did not recall seeing any footprints in the snow during his searches, either around the vehicle or in the area of the bridge.
Either before or after reaching the bridge, Muller called in a report to Claverack barracks to report the prisoner’s escape,[3] and, on a cell phone, he called another Trooper to come provide assistance. State Police Trooper Serani arrived to assist Muller, and together they continued to look in the area. They also called a tow truck to remove Johnson’s vehicle. Shortly thereafter, other Troopers arrived to continue the search, and Muller was directed to go back to the barracks.[4]
Bruce Mann testified that he had been with Tim Johnson all day on the 20th and that they had had a number of beers and mixed drinks throughout that time. According to Mann, they were both drunk when Trooper Muller pulled them over. His account of subsequent events largely corroborates that given by Muller, although Mann said that he saw Johnson pull his hands away from Muller when he was being cuffed.[5] After Johnson’s escape was discovered and the Trooper left for the area around the bridge, Mann got out of the truck and began walking to Hudson. A short while later he arrived at a relative’s house and was given a ride to a nearby inn.
In a subsequent internal administrative investigation conducted by the State Police, it was determined that Trooper Muller had been negligent "in the proper safeguarding of a prisoner in custody” (exhibit 18, mem dated Mar. 30, 1993, Lieutenant Thomas M. Wood). According to Lieutenant Wood, Muller violated regulation 8.10 of the New York State Police Administrative Manual: "A Member who has in his custody or *197 who is charged with responsibility for the custody of any person or persons under arrest or detention shall be responsible for the proper safeguarding and protection of such person or persons and his or their property.”
It was not until July 5, 1993, over three months later, that Johnson’s body was discovered partially submerged in Claverack Creek. Its location was estimated by the coroner, Kenneth Hamm, to be about one quarter of a mile from Route 23B. There was a handcuff hanging from the body’s right wrist, and the left hand was missing. An autopsy was performed by Dr. Jeffrey Hubbard, who found no penetrating injuries or other signs of trauma. The coroner’s report stated that foul play had been ruled out, and the death certificate listed "Cause [of death] undetermined after complete autopsy (postmortem decomposition)” (exhibit 13).
According to Trooper Muller, it is his practice to use handcuffs whenever he makes an arrest. The New York State Police Field Manual (exhibit 17) does not require nonfelony and nonviolent prisoners be handcuffed but instructs officers to "always consider” handcuffing when making an arrest. Factors to be considered include "the temperament of the prisoner, the propensity of the prisoner to attempt an escape, and whether or not assistance is immediately available” (id., § 31D2 [b] [1]). As noted above, Muller testified that after speaking with Johnson, he did not think that he would try to escape. In fact, according to Muller, Johnson had been cooperative and compliant throughout the entire episode, doing nothing to cause alarm and making no threats of violence or resistance. The Field Manual also cautions that officers use "no more force than is legally and reasonably necessary to effect the arrest” and to "[a]llow the arrestee to retain as much dignity and self-respect as possible, under the circumstance of being arrested” (exhibit 17, § 31C3 [b], [d]).
When an arrestee is to be handcuffed, the Field Manual further recommends that the officer "[a]lways consider handcuffing behind the back” (id., § 31D2 [2]), and whether handcuffs are put in the back or front, the Manual states, "consider applying the handcuffs with the palms out” (id.). Johnson was handcuffed with his palms facing in and his hands in front of his body. It should be noted that whenever the Field Manual directs officers to consider a certain course of action, it indicates that the ultimate decision "must be based on good judgment.”
With regard to seating prisoners in the police vehicle, the Field Manual directs that when the officer is transporting *198 alone, the prisoner is to be seated in the front of the vehicle (id., § 31D4 [b] [2]). All prisoners are to have the seatbelt affixed, and the Manual provides as follows: "when a prisoner is handcuffed in front with handcuff cover and waist chain, thread the seatbelt between the prisoner’s arms so as to restrict arm movement.” As noted above, Muller placed Johnson in the front passenger seat of the patrol car. He did not secure Johnson’s arms, and he testified that he saw no need for a handcuff cover or belt (which has replaced waist chains). In any event, he did not have a belt in the car.
Claimant’s expert, G. Lawrence Kronau, was a member of the New York State Police for 26 years and is now retired. He testified that in his opinion, considering all the circumstances, Trooper Muller did not take proper precautions in order to prevent his prisoner’s escape. Even though Johnson was being cooperative, Kronau stressed that because he was intoxicated, Muller should have had heightened awareness that his reactions would be difficult to anticipate. The more appropriate course of action, according to Kronau, would have been to call a tow truck to remove Johnson’s vehicle and stay with Johnson once he was under arrest. Alternatively, the Trooper could have had Johnson wait outside and handcuffed him to the post of the car. On cross-examination, Kronau acknowledged that the Field Manual provides for the officer to use his or her own judgment and discretion with respect to whether or not an individual such as Johnson should be handcuffed. Because the Manual did not require that a nonfelon, nonviolent arrestee be handcuffed at all, Kronau agreed that Muller was actually acting more strictly than absolutely required.
Discussion
There can be no dispute that once Trooper Muller intervened and took custody of Tim Johnson, and particularly after he rendered him somewhat helpless by applying the handcuffs and because he knew that Johnson was intoxicated, Muller had a duty to exercise reasonable care in protecting Johnson from bodily harm (Parvi v City of Kingston, 41 NY2d 553, 559; Restatement [Second] of Torts § 324). The more difficult questions are whether it was reasonably foreseeable that Johnson would move from the safety of the patrol car into peril and, even if Muller was negligent, whether any claim by Johnson or on behalf of his estate is barred because his death was a *199 direct result of his commission of the crime of escape in the third degree (Penal Law § 205.05).[6]
None of Muller’s actions or omissions directly violated any mandatory, nondiscretionary rule contained in either the Administrative Manual or the Field Manual. As is evident from the language quoted above, an officer’s decisions about whether to handcuff an arrestee, how to handcuff him, and what if any other restraints to employ are all matters that, ultimately, are left to the officer’s own best judgment. Nor does the evidence support a conclusion that Muller’s decisions about what course to follow in this instance were unreasonable.
The key to determining whether there was negligence in this situation (or, in similar situations, to safeguard others from his prisoner) is foreseeability, which depends on the particular circumstances of each case. Although there are relatively few cases in which the State’s liability for injury caused to an escaping prisoner has been discussed, the Court of Appeals directs that the same analysis be used in that situation as when an escaping prisoner causes injury to the person or property of a third party (Dunn v State of New York, 29 NY2d 313, 317, and cases cited therein) or where an in-custody prisoner is harmed by another (Gordon v City of New York, 70 NY2d 839, 842). As the Court stated in the last-noted opinion, "[w]hether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant’s acts or omissions” (at 841).
In Williams v State of New York (308 NY 548), the State had been negligent in allowing an inmate to escape, and the inmate’s actions caused the death — from fright — of a person he kidnapped. Nevertheless, the State was not liable. "[E]ven where negligence and injury are both properly found, the negligent party can be liable only where the negligence charged was the proximate cause of the injury received” (supra, at 553). The Court found nothing in that particular inmate’s history to suggest that he would be a danger to others. He had no history of psychosis; the crime for which he was imprisoned was a toy pistol holdup; his prison record was "tranquil”; and his only parole violation had been for failure to make weekly reports to his parole officer (at 555). The assault or threat of assault that he carried out against the plaintiff’s decedent was *200 not, therefore, the " 'risk reasonably to be perceived’ ” (supra, at 554, quoting Palsgraf v Long Is. R. R. Co., 248 NY 339, 344). Referring to another, somewhat similar situation — where an inmate attacks another inmate — the Court reiterated that in its operation of schools, hospitals and prisons the State is like any other party and liable " 'only for hazards reasonably to be foreseen, only for risks reasonably to be perceived’ ” (supra, at 557, quoting Flaherty v State of New York, 296 NY 342, 346).
In Dunn v State of New York (29 NY2d 313, supra), the Court of Appeals determined that the State was likewise not liable for injuries caused when an escaped mental hospital patient— admittedly violent and dangerous — killed another motorist while driving negligently in order to avoid recapture. Despite the State’s negligence in permitting the escape, the Court found that the inmate’s driving — not the escape itself or any intentional violent action on the part of the inmate — had been the proximate cause of the accident. "[P]roximate cause is a question separate and apart from that of duty and negligence and it is only when these initial issues are resolved against the tort-feasor that the question of proximate cause arises” (supra, at 318). Here, according to the Court, a fatal car accident was a "remote” consequence of the State’s negligence in permitting the escape that could not have been " 'reasonably anticipated’ ” (supra).[7]
On the other hand, where proven negligence permits a prisoner who is known to be dangerous and is negligently allowed to attempt an escape and shoots a third party in making that attempt, liability has been imposed. "[T]he ultimate act of shooting by prisoner James should have been foreseen by the defendant as a reasonably prudent person under the circumstances” (Nelson v City of New York, 100 Misc 2d 309, 314). The outcome was the reverse, however, where the escapee had no history and had been so docile in custody that there appeared to be no need for handcuffs or other restraints (Scott v City of New York, 2 AD2d 854, affd 9 NY2d 764).
When it is the prisoner or inmate, rather than a third party, who is injured, foreseeability continues to be the critical element. This is not to say that it is easy to determine what particular risk was foreseeable, particularly where the injured party was inebriated. In Parvi v City of Kingston (41 NY2d 553, supra), liability was imposed where police officers took *201 into custody two inebriated individuals and transported them to a remote area outside of the city so that they could "dry out” (at 555). The majority of the Court found that it was "reasonably foreseeable” (at 560) that these individuals, who had been given no directions for a safe return to town and who were clearly intoxicated, would wander 350 feet onto the adjoining superhighway, where one was killed and one was injured. There was a strong dissent in that case, however, which focused on the "slight” (at 563) risk posed by the highway, the presence of shelter at the location where they were left, the police officers’ earlier rejection of a place closer to the highway with no shelter, and the officers’ kindness in refraining from locking the men up on a holiday weekend.
Similarly, in Thomas v State of New York (46 NY2d 1043), the majority found liability where, in responding to pleas of an intoxicated arrestee that his handcuffs be loosened, a police officer allowed him to exit the patrol car onto an icy pavement and the man fell and broke his nose. Once again, there was a strong dissent, urging that the officer had employed reasonable care and stressing that "[w]hile a person in an inebriated state obviously requires some degree of special care, it is totally unreasonable to demand that police officers insulate such an individual from all unexpected harm” (supra, at 1046 [Jasen, J., dissenting]). And in Greenan v Brown (140 AD2d 488), the Second Department held that there were questions of fact as to whether police officers acted reasonably when they arrested a man on the Brooklyn Queens Expressway, handcuffed him, and told him to stand between two cars but put up no flares or cones to divert traffic. An oncoming car struck the parked cars, which in turn struck and injured the arrestee.
In the instant case, the question is not so close. Johnson, while intoxicated, was not resisting arrest and does not appear to have been incoherent or volatile. His friend does not report any irrational behavior or speech, and Trooper Muller was apparently able to converse with him regarding the disposition of his vehicle. Moreover, Johnson had already been left alone in the patrol car on one occasion with nothing to suggest that he considered even moving from the spot. There was no evidence to indicate that he was so intoxicated or agitated as to be incapable of rational thought, which should have been enough to preclude his taking off into snow-covered woods while handcuffed.
Finally, negligence is determined by the magnitude of risk weighed against the "utility of the act or of the particular *202 manner in which it is done” (Restatement [Second] of Torts § 291). Here, the risk of escape, particularly a successful escape, was quite small, and Trooper Muller was also obliged to consider the risk to the public of leaving Johnson’s truck in the roadway for a period of time, which would have been necessary even if a tow truck were summoned. To his credit, it is apparent that he also considered the cost and inconvenience to Johnson if the truck were towed. Certainly in hindsight the wrong decision was made, but it is not with hindsight that negligence is measured. (Danielenko v Kinney Rent A Car, 57 NY2d 198, 204.)
There is, moreover, an additional bar to recovery in this situation, one that is not present when the person in custody is injured through circumstances entirely unrelated to wrongdoing on their part. This bar arises when death or injury is caused by the injured party’s "own willful behavior in engaging in hazardous and illegal conduct” (Tillmon v New York City Hous. Auth., 203 AD2d 19, 20).
In Barker v Kallash (63 NY2d 19), the Court of Appeals denied recovery by an individual who was injured while in the process of constructing a pipe bomb.[8] The Court first distinguished between lawful activities regulated by statute and activities which are entirely prohibited by law. Violation of the former type of statute goes only to the issue of negligence, and the high Court had earlier permitted recovery where an intoxicated motorist was killed on a segment of roadway where the State had posted incorrect signs and negligently failed to remove inaccurate road markings: "Claimant need not exclude all other possible causes of the accident. The fact that decedent’s ability to drive was impaired does not exonerate the State from liability on the ground that its negligence was not one of the proximate causes of the accident.” (Humphrey v State of New York, 60 NY2d 742, 744.) Drinking is an activity regulated by statute but not entirely prohibited by law. On the other hand, making bombs — or, here, escaping from official custody — are entirely prohibited.
In Barker (supra, at 24), the Court of Appeals also required that the injured party’s actions must be a "serious violation of law” and that the injuries a "direct result” of that violation. Thus, the Court explained (at 25), recovery would not be prohibited "merely because the plaintiff’s injuries were 'oc *203 casioned’ by a criminal act” — such as driving under the influence of alcohol in Humphrey (supra) or becoming involved in an automobile accident on the way to the site of a planned crime. Where, however, the injurious action would not and could not have occurred if the crime were not committed— such as the youth who was burned when his pipe bomb exploded or a burglar who breaks his leg because of a missing step inside the house he is robbing — there can be no recovery (Barker v Kallash, 63 NY2d 19, 26, supra). Here, of course, Johnson’s death directly resulted from his escape from custody and would not have occurred if he did not commit that crime.
Whether the criminal conduct is serious or egregious is, of course, a more difficult determination to make in some situations (supra, at 26; La Page v Smith, 166 AD2d 831, 833, lv denied 78 NY2d 855). Like construction of a pipe bomb, however, escaping from official custody involves "hazardous activities which were not justified under the circumstances” (Barker v Kallash, 63 NY2d 19, 26, supra) and is not "an inherently innocuous activity” (supra, at 27). Moreover, the crime of escape — fleeing from lawful authority — is so contrary to the fundamental order of our legal and law enforcement system that it can be said to be "gravely injurious to the public interests” (supra, 63 NY2d, at 31-32 [Jasen, J., concurring], citing McConnell v Commonwealth Pictures Corp., 7 NY2d 465, 469-471). The crime is considered sufficiently serious that independent proof of intent is not required (except where there are facts suggesting another compelling purpose, as attempting to flee from a fire) (People v Hutchinson, 56 NY2d 868; People v Paige, 122 AD2d 494, lv denied 68 NY2d 815), and it is a separate substantive offense for which punishment can be imposed even if the person in custody was found not guilty of the offense for which confinement was originally imposed (People v Maldonado, 86 NY2d 631; People v Evans, 85 Misc 2d 1088).
The rule prohibiting a lawbreaker from profiting from his or her illegal conduct is grounded in public policy and — again, where the conduct is entirely prohibited by law, is a serious violation, and directly causes the injury — the concept of contributory or comparative negligence is simply inapplicable (Barker v Kallash, 63 NY2d, at 28, supra). There are also public policy considerations implicit in the fact that, as discussed above, the State or municipality will not in all circumstances be liable to innocent third parties who are injured by someone who has escaped or is escaping (see, Williams v State of New York, 308 NY 548, supra, and cases cited therein). In Califor *204 nia, where public entities and public employees are statutorily immune from liability for harm caused by an escapee, the Supreme Court has remarked on both the chilling effect on law enforcement officials and the inherent senselessness of any statutory interpretation that would "preclude an innocent bystander from recovering damages caused by a public employee’s negligence in allowing a prisoner to escape, but permit the prisoner to recover damages resulting from a self-inflicted injury under the same or similar circumstances” (Ladd v County of San Mateo, 12 Cal 4th 913, 920, 911 P2d 496, 500).
The court finds that claimant has failed to prove by a preponderance of the credible evidence that the State is liable for the unfortunate death of Timothy Johnson, both because his escape and ultimate injury was not foreseeable and because, as a matter of public policy, the direct cause — his commission of a serious crime — precludes recovery. The Chief Clerk is directed to enter judgment dismissing the claim.

. Muller also asked headquarters for an alco-sensor device, to better estimate the amount of alcohol that had been consumed, but none was available. There is no record of this call-in on the Claverack barracks radio log for March 20.

. Mann testified that Trooper Muller shouted something like "Don’t play games or I’ll shoot.” In a March 25, 1993 statement (exhibit 18), Mann said that Muller "started swearing and yelling w[h]ere are you Johnson,” and at a June 1995 examination before trial he reported Muller as having said "I’ll shoot you, Johnson” or words to that effect. Trooper Muller testified that he did not recall making statements of this nature.

. The radio log indicates that this call was made at 7:55 p.m.

. At trial, claimant withdrew that portion of the claim based on allegations that the State Police were negligent in conducting the search for the body of Timothy Johnson.

. In a statement given five days after these events, Mann made no reference to any resistance on Johnson’s part when he was handcuffed.

. A person is guilty of escape in the third degree, a class A misdemeanor, when he escapes from custody, i.e., from "restraint by a public servant pursuant to an authorized arrest or an order of a court” (Penal Law §§ 205.00, 205.05).

. The question of whether the State Police had been negligent in pursuing the fleeing escapee was treated as a separate issue.

. The injured person sued those who had provided the firecrackers from which gunpowder was extracted.